Larry Watts, Melissa Lozani, and I represent Jarrell Caldwell. Mr. Caldwell, up until he was discharged, or forced into constructive discharge, resignation, and given a dishonorable discharge by the Constable of Precinct 6, Victor Trevino. Well, Counsel, let me get your position on whether or not he was actually discharged. He was asked about this date that his doctor had set for his return, and he didn't want to answer that, apparently. He didn't answer it. And then he left. Where was he? How was he discharged? Well, he did answer that, Your Honor, in his deposition, as Mr. Degorski pointed out to the court on... Well, his deposition isn't really timely, is it? I mean, Judge Ridley's point is that he was given an opportunity to respond, and he did not respond at the time. Well, he did respond at the time, Your Honor. I think that he was out sick. And so what happened is we have, if you look... When did he first say, no, I didn't make the alteration, it was the nurse? The... I don't think that question was ever asked of him.          I don't know. I don't know. I don't know. I don't know. I don't know. I don't know. Well, I'm not going to give you the details of the alteration, but you can go to a doctor  And he does say, you're not the alter to us, but you explained it. And he did what? Well, to look at the chronology of things, what happened... Excuse me, Judge, but... No, I'm listening. I'm writing. Okay. To look at the chronology of things, Caldwell finished a major project of rewriting a contract on the 24th of September. Felt ill, got dizzy, has a heart condition. And all the symptoms that he felt, sent him to his doctor's office with the permission of his captain, Alejandro. He goes to the doctor's office, and Alejandro sort of chronologically addresses that in the record at 3318 and 3319, although we don't agree with all the facts that he states. They're self-serving. But what he states in there is that he did indeed, this is his letter of September 26th, his memo to Caldwell. He says he told Caldwell to take care of his health and keep him informed. He told, he says then on the 25th that Caldwell spoke with him and told him that he was going to be on leave until October 22nd. Alejandro then says that he informed Caldwell that he needed a doctor's note to confirm his time off was due to illness, and Caldwell said he would drop the note by after hours. At that point in time, Alejandro finishes up his memo at record 3319 and says that on Thursday Caldwell failed to report to duty. Well, he wasn't supposed to report to duty. He was dropping off a doctor's note. Now, nothing in there about time or date, and so when he's first addressed with that point that we see, we look at the record 3314, 3313 and 3314, and this is where the Chief Deputy, Carolyn Lopez, writes a letter, ostensibly writes a letter, signs a letter, and the last paragraph states, now this is the shifting reasons for termination, but in the last two paragraphs she states, Constable Trevino was about to terminate your employment for job abandonment because we've not heard from you in several days, which is not factually consistent with the record that you have before you. When we received your email below, in the email you attached a doctor's note, which reportedly excused you from work from 10-8-13 to 10-27-13. This note did not excuse your absences from work from September 26th to October 5th. Of course, you'll remember that there was a conversation going on, according to Alejandro, that covered that time period. Lopez goes on to say, this note did not excuse your absences from work from September 26th to October 5th. As allowed by law, we contacted your doctor's office to authenticate the note. We were disappointed to learn from the doctor that he only excused you from work until October 17th, not until October 27th. Attached is a copy of the doctor's note that the doctor stated he had provided to you. Submitting a false doctor's note alone is grounds for termination. The constable plans to terminate your employment effective, end of business day, Monday, October 21st, 2013. Now- Did it also say you had an opportunity to respond? The next day, the doctor sent a note saying that, in fact, that was the date that came from his office, that because of testing that had to be done. And that essentially what he said was, if you have any questions, call me. And they didn't call me. We have an affidavit that we were able to obtain from the doctor and from his nurse at the time. And no one ever called. No one from Precinct 6 ever called. The interesting thing about that, we've now seen, as of Carolyn Lopez's letter, and the brief that they've submitted here, and the argument that we had on the 22nd of January last year, we've seen three reasons, essentially, they've given for the sudden change in this outstanding officer's career. The first change was, according to the January 22nd argument, the major point, according to Ms. Calliston, was that when the court said, if there was one explanation for why his performance seemed to deteriorate so rapidly, or was there a lot of, and this is at record 40-43, Ms. Calliston says, it wasn't that his performance deteriorated so rapidly. It was that it was something that was so important to the office that he handled so poorly. Now she's leading into the Zamora matter. Well, when we get to the letter that came before his termination from Lopez, Zamora's name's not even mentioned. So that probably was a gross afterthought. In fact, when we get to the doctor, back to the doctor's note, and I think that's at 41-45, just a moment, Mr. Nagorski was in conversation with the court, and so Mr. Nagorski said on page 108 of the transcript, what, 41-45, so it seems from the deposition record, now this, we've gone forward, we're now at the deposition, and there's a time that's elapsed, but there has been communication, Your Honor, between, Mr. Caldwell twice delivered volumes. He was on FMLA. That was not rejected according to policy. But in the deposition, Mr. Nagorski says, so it seems from the deposition record that he says that the nurse changed the note on the affidavit from Dr. Tomas Garcia that he submitted on October 28th, or that was dated October 28, 2015, and I may be getting this wrong, Your Honor. I want to be correct, but I believe that the affidavit says that the doctor ordered the change to the 27th, the court says. So anyway, two years after this happened, you heard about the alteration? Yes, Your Honor. Now, it was at the time of January 22nd that this alteration became more than simply what Carolyn Lopez had been alluding to as we were disappointed. It then became, on January 22nd, forgery by my client. So when the judge says to Mr. Nagorski, so two years after this happened, you heard about the alteration? Yes, Your Honor. Ms. Calliston says yes. The court says, that's what I wanted to know. And then he goes back and they point out that for the first time, looking at 4148, the court says, I thought they confirmed with the doctor's office. And I said, no, not until after the fact, and that's when they learned that it hadn't been changed, that it had been a 17 and that it was by the doctor's office confirmed, changed to a 27. They then say, at the end, when the judge is going through it, they say that they learned the judge asked them a question directly. So that he asked, did you learn that the, and I can't find the point right now, but I'll find it in just a moment, that he asked, did you find then that the document was forged, that he had signed it without authorization, that my client had. They said yes. So we have in a space of the hearing and the documents by, in the document by Carolyn Lovis, the chief deputy, we have the alteration of, not of the document, but the alteration  If, if it's any significance to anyone other than Caldwell, and by that I mean if they were, if they were concerned about that, then certainly they would have, have indicated to the, gotten something from the doctor that stated that, or they would have had some information, some affidavit themselves from the doctor. Okay. You probably need to move to your other arguments. Yes, ma'am. The, so Zamora investigation, I don't think is a valid issue. I think that came up after the fact. They were never interested in it. There are no memos regarding it. They gave three levels of questions. The, but there was no interest exhibited in the deposition of Trevino. He says himself that when Caldwell tried to explain to him and bring him forward on what had happened and what the investigation had entailed on August the 21st that he turned him away. We know from the affidavit of Captain Berry that the investigation was available, it was on file, and it was available. They produced a part of the investigation, but Captain Berry, who has no dog in the fight, said that the entire investigation, 60 pages of it, was available to anybody that had wanted to read it, that he knew about it, that he was kept current. So on the free speech issue, the free speech issue, I think, is the judge says that, well, the, I don't see where he spoke as a citizen. He spoke in, within the course of his employment. Lane changed all of that. Lane says as long as it's within the scope of duties. Well, within the scope of duties is exactly what you'll see that the two recorded meetings that my client had with District Attorney Jones show happened. My client was asked to deliver information, get information, provide information. The other non-recorded meetings show that my client brought to Jones' attention as Jones was asking him to get other co-operating evidence of the perfidy of Victor Trevino. My client brought to his attention the fact that there was a large amount of money given to the constable for bicycles. I said mistakenly motorcycles, but bicycles, and that the money and the bicycles never appeared, never occurred. When the judge seemed to make, the trial judge seemed to make the decision that, well, taking the argument from the defendants, giving them more credit, I think, than they're due under the rules, he says, well, but in effect, there was no crime. There was no crime that was alleged. My client is protected in his conversations with the District Attorney, whether it's a crime that he's discussing or whether it's simply malfeasance. The second thing about the judge says in his final sum up of the issues when we were there on the 22nd, he says that I think all Caldwell's statements were job-related. They were within the permissible. Counsel, you saved time for rebuttal here. I will. Please forgive me. No, that's fine. You saved time for rebuttal. Thank you. May it please the Court, I just want to hit a few specific points and then cite some cases to you that have come up recently and then answer any of your questions about this case. The first thing I want to talk about is the Liberty Interest Claim. The appellant relies on the Turner v. Perry decision out of the 14th Court of Appeals for the proposition that Section 614.023 of the Government Code creates a property right in the employment or the job that the appellant had.  That's this Court's opinion, which held that Section 614.023 of the Government Code does not create a property right. That holding has now been confirmed by the Supreme Court of Texas in Colorado County v. Staff, which was issued in February of this year. In the Staff case, the Supreme Court said that Sections 614.022 and 614.023 do not abrogate the right to discharge an employee at will or require cause for termination. Rather, the statute sets out a process for addressing discipline, including termination, when discipline is based on a complaint of misconduct. And then the Court went on to say that the creation of procedural rights for cause-based dismissal does not limit the sheriff's ability to terminate at will, nor does conditioning an employee's removal on compliance with specified procedures in specified circumstances equate to an entitlement to continued employment or a modification of the at-will employment relationship. In other words, there is no property right in the job held by a deputy constable in Texas. The next thing I want to mention is the Section 1983 liability aspect of this case. The appellant relies on the Nagel case, another case out of the 14th Court of Appeals, for the proposition that constables are policy makers for the county in Texas. That issue is controlled by this Court's decisions in Rode v. Denson and Keenan v. Tejada. Both of those cases held that county constables in Texas are not policy makers and their actions do not bind the county as would the actions of a policy maker. This holding of Rode and Keenan was recently confirmed by this Court in Bowden v. Jefferson County. Now that is an unpublished opinion, which was issued in January of this year, so it's not pressing, but it does remind us what the law in the Fifth Circuit is, and that is that constables in Texas are not final policy makers for the county. As the Court said in the Bowden case, as demonstrated by the Court's limiting language in the Nagel case, the Texas Court's finding that the Harris County Precinct 1 constable was a policy maker is limited to that county's constable for the specific purpose covered by the broad delegation of serving mental health warrants. The limited holding in Nagel is inapplicable here. Now Bowden is an employment case like this one. The sheriff, I believe it was, or the deputy sheriff, I should say, was terminated by a new sheriff who had, I think, terminated him because he felt that he had opposed him politically. So it's the same kind of thing. It's a 1983, Section 1983 claim, and this Court said specifically that Constable Salim is not a policy maker under Texas law. So we submit that with respect to the 1983 liability aspect of the case, that the Nagel case does not control or give any guidance on this case, that this case is controlled by Rode and Keenan, and now Bowden. Now with respect to the constructive discharge issue, in his reply brief, the appellant says that the appellees did not present the constructive discharge argument made in their brief before the district court. If you will look at the defendant's reply to the plaintiff's response to the defendant's motion for summary judgment, and that appears at ROA.3410, if you look at that reply, you will see the same argument regarding constructive discharge that appears at ROA.3416 to 3418. That's the same argument that's argued in the appellee's brief before this Court. So the contention that the constructive discharge argument made by the appellees in their brief before this Court, the contention that it was raised for the first time on appeal is not correct. It was raised before the district court in that reply. I think their argument was it was not raised at the time of the discharge as well. They also say it wasn't raised at the time of the discharge. Correct. I mean, you're quite correct that when given the opportunity to respond to the concern over whether he'd altered that doctor's note or not, he didn't respond at all. He didn't tell them anything. Now, with regard to the summary judgment record in this case, it's very important to keep in mind that any evidence bearing a record citation beyond ROA.3501 is not part of the summary judgment record before you. As this Court said in Topalian v. Erman, the Court's inquiry is limited to the summary judgment record before the trial court. In this case, nothing beyond ROA.3501 can raise a fact issue. That includes the Gillis affidavit, the appellant's EEOC charge, and the declarations of April Martinez, T.S. Berry, and Heather Perry. They were brought in, but those documents were introduced in connection with the appellant's motion for new trial. They're not part of the summary judgment record that the district court was considering at the time the summary judgment was granted. Now, in his reply brief, the appellant argues that the rogue officer issue was not presented as a reason for the appellant's discharge at the hearing before the State Office of Administrative Hearings. The thing to keep in mind there is that nothing was presented at that hearing other than the announcement of a settlement between the appellant and the county. But the investigation of the appellant's conduct regarding the rogue officer issue was definitely ongoing at the time of his termination. If you will look at ROA.2601... So you are saying he was terminated? Well, he's certainly an F-5. I thought you said he resigned before he was terminated. Well, he did tender a resignation, but the constable's office sent in an F-5 reflecting a discharge, a disarmable discharge. Now, that later was modified pursuant to the settlement agreement that I mentioned a while ago, which was announced at that hearing before the hearing officer. But if you look at ROA.2601 and 2603, you will see that ongoing investigation of the rogue officer issue mentioned in writing. Those two documents are letters addressed to Mr. Caldwell signed by Chief Lopez. And she mentioned specifically in both those letters that investigation is ongoing and that he was to turn in his county equipment and to not function as peace officer until those investigations were resolved. I'm sorry, what was the date of that? The date of the letters. The first one, the one at 2601, is September 26, 2013. The second letter, which is 2603, that letter is dated October 4, 2013. So they both predate his submission of his resignation letter. And the existence of those two letters, I think, is responsive to counsel's point where he says that we just told you that there were no memos regarding the Zamora incident, as if there was no interest in the Zamora incident. These letters show you clearly that the office was engaged in an ongoing investigation of what had he done with respect to the contact with the Conroe Police Department and looking into the question of who is it that's stopping motorists inappropriately and harassing them. And Mr. Caldwell did not disclose that information to the counsel in a timely manner. Now, with respect to the problem of the doctor's note, I think that the evidence reflects that the constable's office drew some conclusions from what they did receive from the doctor's office. Carlos D'Alejandro had contacted the doctor's office, and he spoke to the secretary there, asking for her to send a copy of the note that the doctor had written because the constable's office, when they saw that the date of the time off had been altered by somebody, they were concerned, is that the right date or not? So they contacted the constable's office, asked that a copy of the note be sent to them. That secretary pulled the only note that she could find in the file, I suppose, and faxed it over to them. And it was the original document with October 17th. It didn't say October 27th. When they saw that, they drew the conclusion it must be an altered note. Now, I think when this issue was being discussed with the trial court, there was some confusion perhaps in the mind of our trial lawyer about what the court was asking because what the court asked counsel was, did you confirm that the doctor's office had not altered the note? I think she interpreted that as, did you get something that confirmed that the note that the doctor prepared originally was October 17th? And that was the case. But no one was saying, no one on our team represented to the court that Caldwell had forged the note himself. They simply responded to the court that when we contacted the doctor's office, we got a confirmation of what the note said. That's what she was trying to tell the court. And that would be the natural thing to assume. If you say to the doctor, send me the note so I can check it, and he sends you the original, the secretary sent the original, you don't have any idea that there had been an alteration apparently in the doctor's office. It just wouldn't occur to anybody. But there was never any intent to mislead the court about whether Caldwell personally had altered that note. It was just the fact that there was a note, and it was different as it was submitted to the constable's office than what they got from the doctor when they asked for it. So that's my only point on them. Counsel, what was the problem about the rogue officer? Well, you talk about that in the brief, but what did that have to do with the case? Well, I think in part it has to do with the issue of whether the constable had a motive to retaliate against Caldwell for having talked to the district attorney's office. Caldwell went to the district attorney because he was instructed to go to the district attorney by the constable. Why? Well, was Caldwell—he wasn't blaming Zamora, was he? What was his role in the rogue officer? I don't understand. Okay. In other words, the question is how did Caldwell deal with the rogue officer issue? Nobody thought that he was the rogue officer, didn't they? Nobody thought Caldwell was. The Conroe Police Department believed that Zamora, who worked as a reserve for the constable's office, they believed that he was the rogue officer. And they apparently told Caldwell that, but Caldwell did not report that information to the constable. The constable was very concerned about it because he wanted— Well, what was Caldwell's relationship to Zamora? He was a supervisor over Zamora. That's what I thought. Right. And so the constable was concerned about the failure of Caldwell, who was supposed to be finding out what does the information or the evidence indicate about who this rogue officer was. Was Zamora black? No, he's Hispanic. He what? He's Hispanic, I believe. Yeah. All right. Right. And so when the Conroe Police Department provided information to Caldwell suggesting that Zamora, the constable's own reserve officer, was the rogue officer in question who was stopping motorists in Montgomery County. Did we ever find out who he was, who the rogue was? I think the record's clear that it was Zamora. It was Zamora? Yeah. But, you know, in other words, the importance of the Zamora issue, it seems to me in this case, is it undercuts this business of saying that the constable had a motive to retaliate against Caldwell for talking to the district attorney. That's not, you know, they were investigating Caldwell already about Caldwell's own conduct, and for good reason. I mean, the constable had asked Caldwell to find out, do we have a rogue officer in this department or not? And when Caldwell got some information, which he got in May of 2013, he did not report that to the constable. Now, there's a dispute as to did he report to somebody or not, but I believe that some of that evidence that they're relying on may be part of that motion for retrial evidence. So I'm not sure about that. But in any event, the Zamora incident was very important to the constable, and the investigation was still ongoing at the time of the termination. That's probably why it wasn't in the final letter, because they hadn't finished with the investigation. But you can tell from what I cited to you at 2601 and 2603, they were definitely investigating it at the time all this occurred. Does the Court have any further questions? Thank you, Counsel. Thank you. First of all, Your Honors, with the business regarding liberty interest and the name-clearing hearing, Caldwell was never given an opportunity. And in terms of not correcting them at time of discharge, Caldwell was, by October 17th, was blocked off of going even onto the premises. He couldn't even go out there. He had lost his ability to communicate with them by email, and he was prohibited by the Administrative Lieutenant Lozano from going out there. With regards to whether or not the SOA matter might have substituted, since they didn't give him an opportunity for a name-clearing hearing, as they're required to do, I think, under 614, which they never delivered to him, the state law, what happened at SOA is not what counsel says. I don't know what counsel is relying upon. My client went to the State Office of Administrative Hearings, and he was prepared to present the case of why he should not be dishonorable, why he should not have been classified dishonorably, discharged. And when he got there, the county attorney and then unconvicted, now convicted, Truvino, the constable, said, well, look, we'll settle this. What we'll do is we'll change it to a general discharge. If you will just do one thing, and that is give us a doctor's affidavit saying that what happened in terms of give us your medical records and saying what happened in terms of the note. Perfect. He did that. He gave the note. He gave the affidavit. Now, that's about two or three affidavits from that doctor, that Dr. Tomas Garcia, about what happened. They never lived up to their end of the bargain. He's still dishonorably discharged. He still can't get a job as a certified peace officer in Texas. They have never lived up to the bargain. And that's the way they did things out there. In terms of the business about they made a mistake and they really weren't saying that telling the trial judge that my client was a forger, in 4153 of the record of the hearing on January 22nd, the court says to Ms. Towson, lead counsel, he says, well, we have a, I thought it was clear that you checked with the doctor's office and found. She says, yes, sir. He said, the doctor's office said they had not altered the date. She says, that is correct. The court says, and that was contemporaneously with the note or thereabouts? She says, yes, sir. I think that the evidence in the summary judgment is clear that there was no doctor's note that shows it's marked through. There's no evidence that Harris County had any reason to believe anything other than the plaintiff had sent in an altered doctor's note. And the supposition is that the plaintiff himself had been the one to alter it from giving him leave beyond the 17th but to the 27th. The one had been changed to a two. And that is what the evidence shows. And there is nothing, as Mr. Watts, I felt as though that the issue was greatly confused because there was no doctor's note and goes on. Court counsel, I don't believe that I saw anything in the briefs about dishonorable discharge. Did I miss something in the briefs? Yes, Your Honor, I think maybe. I don't know about the briefs. I thought I mentioned that, Your Honor. And by the way, he was— Why was he dishonorably discharged? Alejandro decided he was going to be dishonorably discharged. On October the 28th, the evidence goes that Sergeant McMillan in Precinct 6 went to Alejandro and said, look, by the way, you know my client tried to get a job. He was offered a major position at Precinct 1, Al Rosen's constable precinct here in Houston. And all he had to do was be released by Trevino. Well, they wouldn't let him be released. They told Rosen's investigators when they went over there to get the personnel file and take it back. This is all in the record? Yes, Your Honor. They told the investigators when they went over there, Lozada told them, oh, he's under an investigation by the DA. He's got an IAD investigation. My guy couldn't even take the job. He's still laboring under dishonorable. In terms of the Zamora matter, Your Honor, I think that it's really the timeline and part of the reason I'm— I may be running out a little bit, but the timeline on the Zamora matter. When did that come in? I'm through. May I have just a minute to finish that answer? One minute. In August of 2012, there was a report that came in from the Harris County Sheriff's Department to Precinct 6 that there may have been a rogue officer, a pretender out there on the road on a motorcycle. They sent it over to 6. 6, it was assigned by Barry, Captain Barry, to my client. Captain Barry, my client, looked at it. Then there were two quick in succession reports from two women that said that they had been stopped. But one of the women was very clear. She said, no, that's—they were—when they were shown pictures by my client of motorcycles and uniforms and helmets, no, that's not Precinct 6 that stopped us. No. So that lingered on for about a year. In January of 2013, that's when McCrary, an off-duty police officer in Conroe, was stopped by this rogue officer. The rogue officer left. McCrary got no idea. Then in May 24th, May 23rd, it happened again. May 24th. My client, on May the 28th, when the first—he told them, in Conroe, pull over anybody that has a light blue police shirt and dark trousers. He told the deputy chief to do that. They did that, and they found they got Zamora at a—they got Zamora at a gas station. When that happened— You've exceeded your time. I'm sorry. We've got your briefing. Yes. I apologize. That's all right. May I ask counsel for the defense? Is the discharge dishonorable? Your Honor, I don't want to mislead, and I don't remember specifically what the record says, other than the fact that there was a settlement announced to the hearing officer that there would be a— Has it been clarified yet? Is he still dishonorably discharged? I'm not sure of the answer to that, Your Honor. What? I'm not sure of the answer to that. Well, can you see to it that it is? Yes, sir. We can. You'll tell the court—you'll see to it that that's corrected. Well, I don't have any authority over it. If you can. If I can. All right. But if the court would like, I can submit a letter that tells you specifically whether or not the F-5 was changed. We would like to know that. Okay. And if not, why not? If there was a settlement in the hearing officer that said it was going to be changed, it needs to be changed. Okay. I'll write a letter to the court explaining what happened. Thank you. Thank you. That concludes the arguments for today. The court will stand in adjournment until hopefully 9 o'clock in the morning.